1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BEGAM MARKS & TRAULSEN, P.A.**
11201 North Tatum Blvd., Suite 110
Phoenix, Arizona 85028-6037
(602) 254-6071

Richard P. Traulsen – State Bar #016050
rtraulsen@BMT-law.com
*Local Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Andrea Wilkerson, individually and on behalf of all similarly situated individuals, | Case No.: |
| Plaintiff, | |
| v. | **COLLECTIVE AND CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND** |
| Walgreens Specialty Pharmacy, LLC d/b/a AllianceRX Walgreens Prime and Healthcare Support Staffing, Inc. | |
| Defendants. | |

Plaintiff, ANDREA WILKERSON ("Wilkerson") by and through her undersigned attorneys, hereby brings this Collective and Class Action Complaint against Defendants, WALGREENS SPECIALTY PHARMACY, LLC ("AllianceRx") and HEALTHCARE SUPPORT STAFFING, INC. ("Healthcare Staffing") (collectively "Defendants") and states as follows:

## INTRODUCTION

1.      This is a class and collective action brought by Plaintiff on behalf of herself and all similarly situated current and/or former Call Center Representative employees of

Defendants to recover for Defendants' willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq., the Arizona Wage Act, A.R.S. §§ 23-350, et seq., and A.R.S. §§ 23-364 (the "Arizona Wage Act"), and alleged contractual obligations (or unjust enrichment if no contract is found), and other appropriate rules, regulations, statutes, and ordinances.

2.      The U.S. Department of Labor ("DOL") recognizes that call center jobs, like those held by Plaintiff in Defendants' call center locations, are homogenous and issued guidance to alert and condemn an employer's non-payment of an employee's necessary preliminary and postliminary activities. See DOL Fact Sheet #64, attached hereto as Exhibit A at 2 ("An example of the first principal activity of the day for agents/specialists/representatives working in call centers includes starting the computer to download work instructions, computer applications and work-related emails.") Additionally, the FLSA requires that "[a] daily or weekly record of all hours worked, including time spent in pre-shift and post-shift job-related activities must be kept." Id.

3.      Defendants subjected Plaintiff, and those similarly situated, to Defendants' policy and practice of failing to compensate its call center employees for their necessary pre-shift time, which resulted in the failure to properly compensate them as required under applicable federal and state laws.

4.      Plaintiff seeks a declaration that her rights, the rights of the FLSA Collective Class, and the rights of the Rule 23 Classes were violated and seeks to recover an award of unpaid wages and overtime premiums, liquidated damages, penalties, injunctive and

declaratory relief, attorneys' fees and costs, pre- and post-judgment interest, and any other remedies to which they may be entitled.

## JURISDICTION AND VENUE

5.     This Court has subject-matter jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the FLSA, 29 U.S.C. §§ 201, et seq.

6.     This Court has subject-matter jurisdiction over Plaintiff's FLSA claim pursuant to 29 U.S.C. § 216(b), which provides that suits under the FLSA "may be maintained against any employer . . . in any Federal or State court of competent jurisdiction."

7.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because these claims arise from a common set of operative facts and are so related to the claims within this Court's original jurisdiction that they form a part of the same case or controversy.

8.     Upon information and belief, Defendants' annual sales exceed $500,000 and they have more than two employees, so the FLSA applies in this case on an enterprise basis. See 29 U.S.C. § 203(s)(1)(A).

9.     Defendants' employees, including Plaintiff, engage in interstate commerce—including, but not limited to utilizing telephone lines and Internet—and therefore, they are also covered by the FLSA on an individual basis.

10.     This Court has personal jurisdiction over Defendant AllianceRx because it

maintains offices in the State of Arizona.

11.     This Court has personal jurisdiction over Defendant Healthcare Staffing because the company does business within the State of Arizona, is registered with the State of Arizona, and avails itself of business with companies located within the State of Arizona.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants conduct substantial business within this District, and because a substantial portion of the events that give rise to the claims pled in this Complaint occurred in this District.

## **PARTIES**

13.     Plaintiff Wilkerson is an individual who resides in the County of Maricopa, City of Phoenix, Arizona. Plaintiff worked for Defendants as a Call Center Representative from September 2020 to May 2021. Plaintiff executed her Consent to Sue form, attached hereto as Exhibit B.

14.     Defendant AllianceRx is a Delaware corporation headquartered in Deerfield, Illinois. AllianceRx operates customer service call center locations in Tempe, Arizona; Dallas, Texas; Canton, Michigan; and Pittsburgh, Pennsylvania. *See* "Locations" https://www.alliancerxwp.com/about-us (last visited July 8, 2021).

15.     AllianceRx is a joint venture between one of the largest retail drugstores, Walgreens, and pharmacy benefit manager Prime Therapeutics that provides pharmacy services to consumers. *See generally*, https://www.alliancerxwp.com/ (last visited July 8, 2021).

16.     AllianceRx may accept service via its registered agent Illinois Corporation Service at 801 Adlai Stevenson Drive, Springfield, IL 62703. AllianceRx does not maintain a foreign corporation registration with the Arizona Corporation Commission.

17.     Defendant Healthcare Staffing is a Florida corporation headquartered in Maitland, Florida that provides labor staffing for its clients, including AllianceRx.

18.     Healthcare Staffing specializes in labor staffing for the health care industry, including customer service representatives for pharmacies and pharmacy benefit managers. *See* "Customer Service Reps," https://www.healthcaresupport.com/customer-service-reps-2/ (last visited July 9, 2021).

19.     Healthcare Staffing may accept service via its registered agent Cogency Global, Inc. at 300 W Clarendon Avenue, Suite 240, Phoenix, Arizona 85013.

20.     At all relevant times, Defendants were members of, and engaged in, a joint venture, partnership, and common enterprise, and were acting within the course and scope of, and in pursuant of said joint venture, partnership, or common enterprise.

21.     Upon information and belief, Healthcare Staffing screened employees for AllianceRx. After Healthcare Staffing offered these joint employees employment at AllianceRx, the joint employees began working for Defendants at AllianceRx's call center located in Tempe, Arizona.

22.     Upon information and belief, Healthcare Staffing was compensated at the time joint employees began work for AllianceRx, and Healthcare Staffing continued to be compensated on an ongoing basis while joint employees remained working at AllianceRx's

Tempe, Arizona call center.

23.     Upon information and belief, Healthcare Staffing and AllianceRx jointly had the ability to hire and fire employees, and jointly had the authority to set and/or communicate conditions of employment for joint employees, including the compensation and work hours of the joint employees, and both maintained records for the joint employees.

24.     For all potential Class members who were not hired through Healthcare Staffing and were instead hired directly by AllianceRx, AllianceRx alone had the ability to hire and fire these employees, alone had the authority to set conditions of employment, including the compensation and work hours of the employees, and alone maintained records for the employees they directly hired.

25.     At all relevant times and based on information and belief, AllianceRx and Healthcare Staffing were joint employers of Plaintiff as it is defined in the FLSA. *See* 29 C.F.R. § 791.2.

## GENERAL ALLEGATIONS

26.     Defendants employed Plaintiff as an hourly call center Call Center Representative ("CCR"). Defendants assign CCRs, like Plaintiff, to answer customer calls from Defendant AllianceRx's clients.

27.     Plaintiff's primary job duties included answering calls from Defendant Alliance Rx's customers regarding their prescriptions, helping clients with their online profiles, verifying patient information, performing data entry, and resolving other customer

issues.

28.     Throughout Plaintiff's employment with Defendants, Plaintiff regularly worked at least 40 hours per workweek.

29.     Regardless of whether Defendants scheduled Plaintiff to work a workweek totaling under 40 hours, scheduled to work a workweek totaling 40 hours, or scheduled to work a workweek totaling in excess of 40 hours, Plaintiff regularly worked a substantial amount of time off-the-clock as part of her job duties as a CCR. Defendants never compensated Plaintiff for this time worked off-the-clock.

30.     29 C.F.R. § 553.221 provides:

> Compensable hours of work generally include all of the time during which an employee is on duty on the employer's premises or at a prescribed workplace, as well as all other time during which the employee is suffered or permitted to work for the employer. Such time includes all pre-shift and post-shift activities which are an integral part of the employee's principal activity or which are closely related to the performance of the principal activity, such as attending roll call, writing up and completing tickets or reports, and washing and re-racking fire hoses.

31.     29 C.F.R. § 790.8 states "[a]mong activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance."

### A.     Pre-Shift Off-the-Clock Work.

32.     Defendants tasked Plaintiff with providing customer service to Defendant AllianceRx's clients by use of Defendants' telephones, Defendants' computers, and the programs accessible from Defendants' computers.

33.     Upon information and belief, due to the COVID-19 pandemic, Defendants tasked Plaintiff with working from home using Defendants' telephones, computers, and programs accessible from Defendants' computers.

34.     To access Defendants' systems, Plaintiff, and all other current and/or former CCRs, must boot up their computers and log in to the various computer programs, servers, and applications, and log in to Defendants' phone systems in order to take their first call at their scheduled shift start time prior to being paid. This pre-shift procedure regularly takes 30 minutes per shift, or more if technical issues arise. Defendants did not compensate Plaintiff for this time.

35.     Regardless of how long the boot up and login process takes, Defendants did not allow Plaintiff, and all other current and/or former CCRs, to clock in before the start of their scheduled shift—and only after they completed the boot up and login process.

36.     The pre-shift boot up procedure Plaintiff, and all other current and/or former CCRs, must complete before they begin being compensated is the same regardless of which call center location they worked at or whether they worked from home. The pre-shift boot up and login procedure is integral and indispensable to the performance of Plaintiff's principal job duties and integral and indispensable to Defendants' business.

37.     Thus, the unpaid, pre-shift, off-the-clock work performed by Plaintiff, and all other current and/or former CCRs, directly benefits Defendants.

**B.      *Post-Shift Off-the-Clock Work.***

38.     Defendants required Plaintiff, and all other current and/or former hourly

CCRs, to first clock out of the timekeeping system, then spend time logging out of the necessary programs, servers, and applications, and shutting down their computer off-the-clock. This boot-down process regularly took 3 to 5 minutes per shift.

39.     This post-shift off-the-clock boot-down work performed by Plaintiff, and all other current and/or former hourly CCRs, was integral and indispensable to the primary job duties of Defendants' CCRs and directly benefited Defendants.

**C.     *Defendant's Policy and Practice of Off-the-Clock Work Violates Federal and State Laws.***

40.     At all times relevant, Defendants suffered or permitted Plaintiff, and all other current and/or former CCRs, to routinely perform off-the-clock, pre-shift work by not compensating its employees until after they completed the pre-shift boot up and log in procedure.

41.     At all times relevant, Defendants suffered or permitted Plaintiff, and all other current and/or former CCRs, to routinely perform off-the-clock, post-shift work by not compensating its employees for the post-shift boot down and log out procedure

42.     Defendants knew or should have known that they must pay their employees for all compensable time throughout the workweek. See 29 C.F.R. §§ 553.221, 790.8, 785.19(a).

43.     Despite this, Defendants failed to compensate Plaintiff, and all other current and/or former CSRs, for their off-the-clock pre-shift and post-shift compensable work performed in any amount.

44.     Defendants knew, or should have known, that the FLSA, 29 U.S.C. § 207,

requires Defendants to compensate non-exempt employees who work in excess of forty (40) hours in a workweek at a rate of one and one-half times their regular rate of pay—including the compensable off-the-clock, pre-shift and post-shift work performed.

45.   Despite this, Defendants failed to compensate Plaintiff, and all other current and/or former CCRs, for their off-the-clock pre-shift and post-shift compensable work performed in excess of forty (40) hours in a workweek at one and one-half times their regular rates of pay.

46.   Defendants knew or should have known that Arizona wage and hour laws require an employer to pay employees wages for each hour worked. See A.R.S. § 23-351.

47.   Despite this, Defendants failed to compensate Plaintiff Wilkerson, and all other current and/or former hourly CCRs working in Defendants' call center locations in Arizona for their off-the-clock pre-shift and post-shift compensable work performed in workweeks totaling less than 40 hours and in workweeks totaling in excess of 40 hours at the proper legal rates, including overtime premiums.

48.   Defendants knew or should have known that Arizona wage and hour laws require an employer to promptly pay employees for their earned wages. See A.R.S. §§ 23-351 and 23-353.

49.   In reckless disregard of the FLSA and Arizona wage and hour laws, Defendants adopted and then adhered to its policy, plan, or practice of employing Plaintiff, and all other current and/or former CCRs, to perform pre-shift and post-shift compensable work off-the-clock. This illegal policy, plan, or practice caused incorrect payments for all

straight time and overtime performed by Plaintiff, and all other current and/or former CCRs, in violation of the FLSA and Arizona wage and hour laws.

**D.     Recordkeeping.**

50.     The Arizona wage and hour laws require that "[e]mployers shall maintain payroll records showing the hours worked for each day worked, and the wages and earned paid sick time paid to all employees for a period of four years." See A.R.S. § 23-364.

51.     Further, 29 C.F.R § 516.1 subjects "every employer subject to any provisions of the Fair Labor Standards Act" to maintain employee records.

52.     Federal regulations mandate each employer to maintain and preserve payroll or other records containing, without limitation, the total hours worked by each employee each workday and total hours worked by each employee each workweek. See 29 C.F.R § 516.2.

53.     Upon information and belief, Defendants failed to establish, maintain, and preserve accurate timesheet and payroll records for all hours worked by Plaintiff as required by the FLSA and Arizona wage and hour laws.

54.     When the employer fails to keep accurate records of the hours worked by its employees, the rule in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946) controls. That rule states:

> [w]here the employer's records are inaccurate or inadequate . . . an employee
> has carried out his burden if he proves that he has in fact performed work for
> which he was improperly compensated and if he produces sufficient evidence
> to show the amount and extent of that work as a matter of just and reasonable
> inference. The burden then shifts to the employer to come forward with

evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

55.     The Supreme Court set forth this test to avoid placing a premium on an employer's failure to keep proper records in conformity with its statutory duty, thereby allowing the employer to reap the benefits of the employees' labors without proper compensation as required by the FLSA. Where damages are awarded pursuant to this test, "[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with . . . the Act." *Id.*

### E.     Joint Employer.

56.     Where joint employment exists, each employer has a duty to ensure that the rights provided by the FLSA are enforced as to each employee affected by the joint employment. 29 C.F.R. § 791.2.

57.     The FLSA defines "employer" broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); see Torres-Lopez v. May, 111 F.3d 633, 639 (9th Cir. 1997) (recognizing "that the concept of joint employment should be defined expansively under the FLSA"); see also Fausch v. Tuesday Morning, Inc., 808 F.3d 208, 214 (3d Cir. 2015) (noting "[t]he definition of 'employee' in the FLSA is of 'striking breadth' and 'cover[s] some parties who might not qualify as such under a strict application of traditional agency law principles"). "Where the

employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control with the employee, directly or indirectly" a joint employment relationship may be found to exist. 29 C.F.R. § 791.2.

58.     The Ninth Circuit has generally focused on whether the alleged employer: (1) had the power to hire and fire the employee, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. Gillard v. Good Earth Power AZ LLC, No. CV-17-01368-PHX-DLR, 2019 WL 1280946, *9 (D. Ariz. Mar. 19, 2019) (citing Bonnette v. California Health and Welfare Agency, 704 F.2d 1465, 1469 (9th Cir. 1983)). "All of the incidents of the relationship must be assessed and weighed with no one factor being decisive." Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 324 (1992).

59.     Upon information and belief, Healthcare Staffing facilitated the screening and hiring of some employees for AllianceRx (their "joint employees"), and Healthcare Staffing and AllianceRx together determined the compensation, benefits, and work hours for the joint employees.

60.     In and around September 2020, Plaintiff discussed potential employment at AllianceRx with a representative for Healthcare Staffing.

61.     In and around September 2020, Healthcare Staffing ran a background check for Plaintiff related to potential employment at AllianceRx.

62.     In and around September 2020 a representative for Healthcare Staffing communicated to Plaintiff the hourly wage she would be paid for work performed for

AllianceRx.

63.     Upon information and belief, Healthcare Staffing was paid a lump sum by AllianceRx at the time of Plaintiff's hiring which was payment for Plaintiff's placement at AllianceRx.

64.     Upon information and belief, AllianceRx continued to receive money from Healthcare Staffing related to Plaintiff's continued employment at AllianceRx.

65.     Upon information and belief, AllianceRx controlled a significant part of the terms of Plaintiff's employment, including Plaintiff's scheduling, supervision, oversight, directives, initiatives, and/or expectations of Plaintiff while she worked at AllianceRx's Tempe, Arizona facility.

66.     AllianceRx's employees were responsible for supervising Plaintiff while she worked at AllianceRx's Tempe, Arizona facility.

67.     Plaintiff clocked in and clocked out at AllianceRx's Tempe, Arizona facility.

68.     A record of Plaintiff's working hours was regularly transmitted by AllianceRx to Healthcare Staffing.

69.     Upon information and belief, Healthcare Staffing was responsible for issuing, and did issue, Plaintiff's paychecks to Plaintiff.

70.     On May 7, 2021, Plaintiff was laid off from her work with Defendants. Plaintiff was told by a representative of Healthcare Staffing that AllianceRx "had too many people and not enough work."

71.     Upon information and belief, AllianceRx participated in the decision to

terminate Plaintiff.

72.     Upon information and belief, Healthcare Staffing participated in the decision to terminate Plaintiff.

73.     Upon information and belief, AllianceRx maintained records related to Plaintiff.

74.     Upon information and belief, Healthcare Staffing maintained records related to Plaintiff.

75.     Upon information and belief, both AllianceRx and Healthcare Staffing maintained records related to the employment of their joint employees.

76.     Upon information and belief, AllianceRx and Healthcare Staffing were members of, and engaged in, a joint venture, partnership, and common enterprise, and were acting within the course and scope of, and in furtherance of, said joint venture, partnership, or common enterprise in employing Plaintiff.

77.     Upon information and belief, the same or similar procedures for hiring, firing, supervision, and payment alleged above existed for all other joint employees.

78.     Defendants knew or should have known that, as joint employers, each of the Defendants had a duty to comply with the provisions of the FLSA.

79.     Together, Defendants willfully, or in reckless disregard, furthered policies and practices with respect to off-the-clock pre-shift boot up and post-shift boot down time to evade paying employees, including Plaintiff, at the overtime rate of one and one-half times their standard pay, in violation of the FLSA.

## COLLECTIVE ACTION ALLEGATIONS

80.     Plaintiff brings this action pursuant to the FLSA, 29 U.S.C. § 216(b) individually and on behalf of:

> *All current and former Call Center Representative employees, and/or other job titles performing the same or similar job duties, who worked for Defendants and/or each of them, at any time in the last three years, while working at Walgreens Specialty Pharmacy, LLC.*

(hereinafter referred to as the "FLSA Collective"). Plaintiff reserves the right to amend this definition as necessary.

81.     Plaintiff does not bring this action on behalf of any executive, administrative, or professional employees exempt from coverage under the FLSA.

82.     *29 U.S.C. § 216(b) Conditional Certification "Similarly Situated" Standard:* With respect to the claims set forth in this action, a collective action under the FLSA is appropriate because, under 29 U.S.C. § 216(b), the call center employees described are "similarly situated" to Plaintiff. The class of employees on behalf of whom Plaintiff brings this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are subject to the same or similar unlawful practices, policies, or plan (namely, Defendant's practices, policies, or plan of not paying their CCR employees for their pre-shift, compensable work performed in excess of forty (40) hours per workweek at an overtime premium of at least one and one-half times their regular rates of pay); (c) their claims are based upon the same legal theories; and (d) the employment relationship between Defendants and every putative FLSA Collective member is exactly the same, and differs only by name, location, and rate of pay.

83.     Upon information and belief, Plaintiff estimate the FLSA Collective, including both current and former call center employees over the relevant period, will include several hundred members who would benefit from the issuance of court-supervised notice of this action and the opportunity to join it. The precise number of the FLSA Collective members should be readily available from a review of Defendants' personnel, scheduling, time, and payroll records; and from input received from the FLSA Collective members as part of the notice and "opt-in" process provided by 29 U.S.C. § 216(b).

84.     Plaintiff shares the same interests as the FLSA Collective members in that the outcome of this action will determine whether they are entitled to unpaid overtime compensation, interest, attorneys' fees and costs owed under the FLSA. Because the facts in this case are similar, if not altogether identical, and the factual assessment and legal standards lend themselves to a collective action.

## THE ARIZONA WAGE AND HOUR LAW CLASS ACTION ALLEGATIONS

85.     Plaintiff Wilkerson brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a putative Class defined to include:

> *All current and former Call Center Representative employees in Arizona, and/or other job titles performing the same or similar job duties, who worked for Defendants and/or each of them, at any time in the last one year, while working at Walgreens Specialty Pharmacy, LLC.*

(hereinafter referred to as the "Arizona Class"). Plaintiff reserves the right to amend this definition as necessary.

86.     *Numerosity:* The members of the Arizona Class are so numerous that joinder of all members in the case would be impracticable, and the disposition of their claims as a

Class will benefit the parties and the Court. The precise number of Class members should be readily available from a review of Defendants' personnel and payroll records.

87.   *Commonality/Predominance:* There is a well-defined community of interest among Arizona Class members and common questions of both law and fact predominate in the action over any questions affecting individual members. These common legal and factual questions include, but are not limited to, the following:

     a.     Whether Defendants violated A.R.S. §§ 23-350 et seq. by failing to pay current and former employees for all wages earned;

     b.     The proper measure of damages sustained by the proposed Arizona Class; and

     c.     Whether Defendants violated the A.R.S. by failing to make, keep, and preserve true and accurate payroll records.

88.   *Typicality:* Plaintiff's claims are typical of those of the Arizona Class in that Plaintiff and all other members suffered damages as a direct and proximate result of Defendants' common and systemic payroll policies and practices. Plaintiff's claims arise from Defendants' same policies, practices, and course of conduct as all other Arizona members' claims and Plaintiff's legal theories are based on the same legal theories as all other Arizona Class members: whether all Arizona Class members were employed by Defendants on an hourly basis without receiving compensation for all wages earned.

89.   *Adequacy:* Plaintiff will fully and adequately protect the interests of the Arizona Class and Plaintiff retained national counsel who are qualified and experienced in the prosecution of nationwide wage-and-hour class actions. Neither Plaintiff nor her counsel have interests that are contrary to, or conflicting with, the interests of the Arizona

Class.

90.     *Superiority:* A class action is superior to other available methods for the fair and efficient adjudication of the controversy, because, inter alia, it is economically infeasible for Arizona Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Given the material similarity of the Arizona Class members' claims, even if each Class member could afford to litigate a separate claim, this Court should not countenance or require the filing of hundreds, or thousands, of identical actions. Individual litigation of the legal and factual issues raised by Defendant's conduct would cause unavoidable delay, a significant duplication of efforts, and an extreme waste of resources. Alternatively, proceeding by way of a class action would permit the efficient supervision of the putative Arizona Class' claims, create significant economies of scale for the Court and the parties, and result in a binding, uniform adjudication on all issues.

91.     The case will be manageable as a class action. This class action can be efficiently and effectively managed by sending the same FLSA opt-in notice to all employees similarly situated and adding for the Arizona Class within that group a separate opt-out notice pertaining to their rights under the Arizona state law. Plaintiff and her counsel know of no unusual difficulties in the case and Defendant has payroll systems that will allow the class, wage, and damages issues in the case to be resolved with relative ease. Because the elements of Rule 23(b)(3), or in the alternative (c)(4), are satisfied in the case, class certification is appropriate. Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.,

559 U.S. 393, 398 (2010) ("[b]y its terms [Rule 23] creates a categorical rule entitling a Plaintiff whose suit meets the specified criteria to pursue her claim as a class action").

### BREACH OF CONTRACT CLASS ACTION ALLEGATIONS[1]

92.     Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a putative Class defined to include:

> *All current and former Call Center Representative employees, and/or other job titles performing the same or similar job duties, who worked for Defendants and/or each of them, at any time in the last six years, while working at Walgreens Specialty Pharmacy, LLC.*

(hereinafter referred to as the "Nationwide Class"). Plaintiff reserves the right to amend this definition as necessary.

93.     *Numerosity:* The members of the Nationwide Class are so numerous that joinder of all members in the case would be impracticable, and the disposition of their claims as a Class will benefit the parties and the Court. The precise number of Class members should be readily available from a review of Defendants' personnel and payroll records.

94.     *Commonality/Predominance:* There is a well-defined community of interest among Nationwide Class members and common questions of both law and fact predominate in the action over any questions affecting individual members. These common legal and factual questions include, but are not limited to, the following:

---

[1] To the extent the Court finds, or Defendant argues, the employment relationship between itself and its CCRs did not form a contract, Plaintiff reserves the right to seek Rule 23 class certification under Plaintiff's and the Nationwide Class' quasi-contract claims (Count IV).

a.   Whether Defendants offered to pay Plaintiff and the Nationwide Class certain rates (depending on the technical job titles) per hour for each hour worked as call center employees;

b.   Whether Plaintiff and the Nationwide Class accepted Defendants' offer by performing the essential functions of the job;

c.   Whether Defendants breached the contract by failing to pay Plaintiff and the Nationwide Class for each and every hour worked; and

d.   Whether Plaintiff and the Nationwide Class were damaged.

95.   *Typicality:* Plaintiff's claims are typical of those of the Nationwide Class in that Plaintiff and all other members suffered damages as a direct and proximate result of Defendants' common and systemic payroll policies and practices. Plaintiff's claims arise from Defendants' same policies, practices, and course of conduct as all other Nationwide Class members' claims and Plaintiff's legal theories are based on the same legal theories as all other Nationwide Class members: whether Defendants and the Nationwide Class members were employed under an implied contract to be paid for each and every hour worked for Defendants.

96.   *Adequacy:* Plaintiff will fully and adequately protect the interests of the Nationwide Class and Plaintiff retained national counsel who are qualified and experienced in the prosecution of nationwide wage-and-hour class actions. Neither Plaintiff nor her counsel have interests that are contrary to, or conflicting with, the interests of the Nationwide Class.

97.   *Superiority:* A class action is superior to other available methods for the fair and efficient adjudication of the controversy, because, inter alia, it is economically infeasible for Nationwide Class members to prosecute individual actions of their own given

the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Given the material similarity of the Nationwide Class members' claims, even if each Nationwide Class member could afford to litigate a separate claim, this Court should not countenance or require the filing of thousands of identical actions. Individual litigation of the legal and factual issues raised by Defendants' conduct would cause unavoidable delay, a significant duplication of efforts, and an extreme waste of resources. Alternatively, proceeding by way of a class action would permit the efficient supervision of the putative Nationwide Class' claims, create significant economies of scale for the Court and the parties, and result in a binding, uniform adjudication on all issues.

98.     The case will be manageable as a class action. This class action can be efficiently and effectively managed by sending the same FLSA opt-in notice to all employees similarly situated and adding for the Nationwide Class within that group a separate opt-out notice pertaining to their rights under the common law. Plaintiff and her counsel know of no unusual difficulties in the case and Defendants have payroll systems that will allow the class, wage, and damages issues in the case to be resolved with relative ease. Because the elements of Rule 23(b)(3), or in the alternative (c)(4), are satisfied in the case, class certification is appropriate. *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("[b]y its terms [Rule 23] creates a categorical rule entitling a Plaintiffs whose suit meets the specified criteria to pursue her claim as a class action").

## COUNT I

**VIOLATION OF THE FAIR LABOR STANDARDS ACT,
U.S.C. § 201, et seq., FAILURE TO PAY OVERTIME WAGES**

**(FLSA Collective Class)**

99.   Plaintiff re-alleges and incorporates all previous paragraphs herein.

100.   At all times relevant to this action, Defendants were an "employer" under the FLSA, 29 U.S.C. § 203(d), subject to the provisions of 29 U.S.C. §§ 201, et seq.

101.   Defendant is engaged in interstate commerce or in the production of goods for commerce, as defined by the FLSA.

102.   At all times relevant to this action, Plaintiff was an "employee" of Defendants within the meaning of the FLSA, 29 U.S.C. § 203(e)(1).

103.   Plaintiff either (1) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) was employed in an enterprise engaged in commerce or in the production of goods for commerce.

104.   The position of Call Center Representative is not exempt from the FLSA.

105.   Defendants' other job titles performing similar customer service representative job duties are not exempt from the FLSA.

106.   At all times relevant to this action, Defendants "suffered or permitted" Plaintiff to work and thus "employed" her within the meaning of the FLSA, 29 U.S.C. § 203(g).

107.   The FLSA requires an employer to pay employees the federally mandated overtime premium rate of one and a half times their regular rate of pay for every hour worked in excess of forty (40) hours per workweek. *See* 29 U.S.C. § 207.

108.   Defendants violated the FLSA by failing to pay Plaintiff the federally mandated overtime premium for all hours worked in excess of forty (40) hours per

workweek.

109.    Upon information and belief, Defendants have corporate policies of evading overtime pay for its hourly workers.

110.    Defendants' violations of the FLSA were knowing and willful.

111.    By failing to compensate its hourly workers at a rate not less than one and one-half times their regular rate of pay for work performed in excess of forty (40) hours in a workweek, Defendants violated the FLSA, 29 U.S.C. §§ 201, *et seq.*, including 29 U.S.C. §§ 207(a)(1) and 215(a). All similarly situated call former CCRs, or other job titles performing the same or similar job duties, are victims of a uniform and company-wide enterprise which operates to compensate employees at a rate less than the federally mandated overtime wage rate. This uniform policy, in violation of the FLSA, has been, and continues to be, applied to CCRs, or other job titles performing the same or similar job duties, who have worked or are working for Defendants in the same or similar position as Plaintiff.

112.    None of the provisions of the FLSA can be contravened, set aside, abrogated, or waived by Plaintiff or the Class.

113.    The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid overtime wages plus an additional equal amount in liquidated damages, costs, and reasonable attorneys' fees.

## COUNT II

### VIOLATIONS OF THE ARIZONA WAGE ACT
**(Arizona Class)**

114.    Plaintiff Wilkerson, individually and on behalf of the proposed Arizona Class, re-alleges and incorporates by reference the above paragraphs as if fully set forth herein.

115.    Plaintiff and members of the Arizona Class are current and former employees of Defendants within the meaning of A.R.S. § 23-350(2).

116.    Defendants at all relevant times were an employer within the meaning of A.R.S. § 23-350(3).

117.    Defendants were required to pay Plaintiff and the Arizona Class for all hours worked.

118.    A.R.S. § 23-351 requires every employer to pay "all wages due" every pay period, including overtime pay.

119.    A.R.S. § 23-353 provides that when an employer discharges an employee or employee quits, the employer must pay the employee all wages due in a timely manner.

120.    Wages are defined as "nondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid whether determined by a time, task, piece, commission or other method of calculation." A.R.S. § 23-350(7).

121.    Defendants, pursuant to its policies and illegal timekeeping practices, refused and failed to pay Plaintiff and the Arizona Class for all hours worked.

122.    By failing to properly compensate Plaintiff and the Arizona Class for all "labor or services rendered" for which Plaintiff and members of the Arizona Class had a

reasonable expectation of being paid, Defendants violated, and continue to violate their CCRs' statutory rights under A.R.S. §§ 23-351 and 23-353.

123.    Defendants' actions were willful, unreasonable, and done in bad faith. See A.R.S. §§ 23-352(3), 23-355.

124.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the proposed Arizona Class have suffered damages in an amount to be determined at trial.

125.    Plaintiff and the proposed Arizona Class seek damages in the amount of their unpaid straight-time and overtime wages for all hours worked, treble damages, reasonable attorneys' fees and costs for this action, pre- and post- judgment interest, and such other legal and equitable relief as the Court deems proper.

## COUNT III

**BREACH OF CONTRACT**
**(National Breach of Contract Class Action)**

126.    Plaintiff and the Nationwide Class re-allege and incorporate all previous paragraphs herein and further allege as follows.

127.    Plaintiff and the Nationwide Class were hired at various times. Defendants offered to pay Plaintiff and the Nationwide Class certain rates per hour for each hour worked as a CCR. Each Nationwide Class members' contractual hourly rate is identified in paystubs and other records that Defendants prepare as part of their regular business activities.

128.    Plaintiff and the Nationwide Class accepted the offer and worked for Defendants as a CCR, and/or other job titles performing the same or similar job duties.

129.    Plaintiff and the Nationwide Class also accepted the offer by their performance—i.e., reporting for work and completing the tasks assigned to them.

130.    Plaintiff's work, and the work of the Nationwide Class, required pre-shift boot up time and post-shift boot down time.

131.    Plaintiff and every other Nationwide Class member performed under their contract by doing their jobs in addition to carrying out the pre-shift and post-shift off-the-clock duties Defendants required.

132.    Upon information and belief, Defendants do not compensate their CCRs, and/or other job titles performing the same or similar job duties, until after the pre-shift boot up and log in procedures are complete and does not compensate CCRs for the post-shift boot down procedure.

133.    Despite being required to complete these integral pre-shift and post-shift job duties, Plaintiff and the Nationwide Class were not compensated at their hourly rate for their work performed.

134.    By failing to pay Plaintiff and the Nationwide Class for the pre-shift boot up time and post-shift boot down time, Defendants breached their contract with Plaintiff and the Nationwide Class to pay their hourly rate for each hour worked.

135.    Defendants also breached their duty of to keep accurate records to keep track of the time Plaintiff and other Nationwide Class members spent doing pre-shift and post-shift activities, which is a fundamental part of an employer's job.

136.    In sum, the facts set forth above establish the following elements and terms of the contract:

a.    Offer: a set hourly rate for each hour worked as a CCR;

b.    Acceptance: Plaintiff and the Nationwide Class accepted the offer overtly or via performance (i.e., each showed up to work and completed the tasks assigned to them by Defendants);

c.    Breach: Defendants did not pay Plaintiff and the Nationwide Class for each hour (or part thereof) worked; and

d.    Damages: By failing to pay Plaintiff and the Nationwide Class their hourly rate for each hour worked, Plaintiff and the Class were damaged in an amount to be determined at trial.

137.    These claims are appropriate for nationwide class certification under Rules 23(b)(3) and/or (c)(4) because the law of contracts is substantially similar throughout the United States.

138.    As a direct and proximate cause of Defendants' breach, Plaintiff and the Nationwide Class were damaged in an amount to be proven at trial.

## COUNT IV

### QUASI-CONTRACTUAL REMEDIES: UNJUST ENRICHMENT
### (National Unjust Enrichment Class)

139.    Plaintiff and the Nationwide Class re-allege and incorporate all previous paragraphs herein and further allege as follows.

140.    Upon information and belief, Plaintiff's and every other Nationwide Class members' pre-shift boot up and post-shift boot down time—which is integral and

indispensable to their principal activities as a CCR—provided valuable work and income for Defendants; namely, compensation to Defendants for completing telephone sales and customer service activities that directly benefited Defendants.

141.   Pre-Shift Boot up Time: Plaintiff and the Nationwide Class were unable to perform any job function without booting up and logging in to their computers and required programs. In short, in order to start their work of fielding customer calls precisely at their designated start time, Plaintiff and the Nationwide Class worked off-the-clock before their shift began. Without the pre-shift boot-up time, Plaintiff and the Nationwide Class were unable to take customer calls at their designated start time. Further, upon information and belief, Defendants do not compensate their CCRs until after the pre-shift procedures are complete.

142.   Post-Shift Boot down Time: Plaintiff and the Nationwide Class could not leave the call center until they logged out of all programs and booted-down their computers after they clocked out. Upon information and belief, Defendants do not compensate their CCRs for the boot-down procedure.

143.   As part of their ongoing employment relationships with Defendants, Plaintiff and other Nationwide Class members expected to be paid wages for the time they spent doing their jobs, including performance of the necessary pre-shift boot up and post-shift boot down procedures performed each shift.

144.   By not paying Plaintiff and other Nationwide Class members for the time they spent performing necessary pre-shift boot up and post-shift boot down activities,

Defendants were, and continue to be, unjustly enriched at the expense of Plaintiff and the Nationwide Class in an amount to be determined at trial.

145.    By not paying Plaintiff and other Nationwide Class members for the time they spent performing necessary activities, Defendants also saved, and continue to save, themselves hundreds-of-thousands of dollars in unpaid payroll taxes—taxes that would have otherwise been credited to Plaintiff's and Nationwide Class members' benefit.

146.    It would be unjust and inequitable to allow Defendants to retain the benefit of the work performed by Plaintiff and the Nationwide Class without compensation.

147.    These claims are appropriate for nationwide class certification under Rules 23(b)(3) and/or (c)(4) because the law of unjust enrichment is substantially similar throughout the United States.

148.    As a direct and proximate cause of Defendants' unjust enrichment, Plaintiff and the Nationwide Class were harmed at an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

a.    An Order certifying this case as a collective action in accordance with 29 U.S.C. § 216(b) with respect to the FLSA claims set forth above;

b.    An Order certifying the Arizona state law class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

c.    An Order certifying this action as a class action (for the Rule 23 Breach of Contract Nationwide Class or for the Rule 23 Unjust Enrichment Nationwide Class if no contract is found) pursuant to Rule 23 of the Federal Rules of Civil Procedure;

d.    An Order compelling Defendants to disclose in computer format, or in print if no computer readable format is available, the names, addresses, and email addresses of all those individuals who are similarly situated, and permitting Plaintiff to send notice of this action to all those similarly situated individuals including the publishing of

1    notice in a manner that is reasonably calculated to apprise the potential
     class members of their rights under this litigation;

2

3    e.    An Order designating Plaintiff to act as the Class Representatives on
           behalf of all individuals in the Arizona Class;

4    f.    An Order designating the Named-Plaintiff to act as the Nationwide
           Class Representative on behalf of all similarly situated individuals for

5          both the FLSA and the Rule 23 Breach of Contract or Unjust
           Enrichment Nationwide Classes;

6

7    g.    An Order declaring that Defendants willfully violated the FLSA and
           its attendant regulations as set forth above;

8    h.    An Order declaring that Defendants violated their obligations under
           the FLSA;

9

10   i.    An Order declaring that Defendants willfully violated the Arizona
           Wage and Hour Law and its attendant regulations as set forth above;

11   j.    An Order granting judgment in favor of Plaintiff and against
           Defendants and awarding the amount of unpaid minimum wages, and

12         overtime pay calculated at the rate of one and one-half (1.5) of
           Plaintiff's regular rate multiplied by all hours that Plaintiff worked in

13         excess of 40 hours per week;

14   k.    An Order awarding liquidated damages to Plaintiff, in an amount
           equal to the amount of unpaid wages found owing to Plaintiff under

15         the FLSA, in addition to all penalties and damages owed under the
           Arizona Wage Act and its attendant regulations as set forth above;

16

17   l.    An Order awarding reasonable attorneys' fees and costs incurred by
           Plaintiff in filing this action;

18   m.    An Order awarding pre- and post-judgment interest to Plaintiff on
           these damages; and

19

20   n.    An Order awarding such further relief as this court deems appropriate.

21                                   **JURY DEMAND**

           NOW COMES Plaintiff, by and through her undersigned attorneys, and hereby
22

23   demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the

24   court rules and statutes made and provided with respect to the above-entitled cause.

25   . . .

26   . . .

27

28

1    DATED this 17th day of August, 2021.

2                           **BEGAM MARKS & TRAULSEN, P.A.**

3

4               By *s/ Richard P. Traulsen*

5                   Richard P. Traulsen
                   11201 North Tatum Blvd., Suite 110

6                   Phoenix, Arizona  85028-6037
                   *Local Counsel for Plaintiff*

7

8                     And

9                   Jacob R. Rusch (MN Bar No. 0391892)*
                   Timothy J. Becker (MN Bar No. 0256663)*

10                 Zackary S. Kaylor (MN Bar No. 0400854)*

11                 **JOHNSON BECKER, PLLC**
                   444 Cedar Street, Suite 1800

12                 Saint Paul, MN 55101
                   E: jrusch@johnsonbecker.com

13                 E: tbecker@johnsonbecker.com

14                 E: zkaylor@johnsonbecker.com

15

16                 *Lead Attorneys for Plaintiff*

17                 *Pro Hac Vic forthcoming*

18

19

20

21

22

23

24

25

26

27

28